Cite as 2024 Ark. 171

# SUPREME COURT OF ARKANSAS

**No.** CR-24-263

|  |  |  |
|---|---|---|
| | | **Opinion Delivered:** November 21, 2024 |
| KE'VON TURNER | | |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION |
| V. | | [NO. 60CR-21-2638] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE CATHLEEN V. COMPTON, JUDGE |
| | | AFFIRMED. |

**SHAWN A. WOMACK, Associate Justice**

Ke'von Turner appeals his conviction for two counts of felony-capital murder following his role in the 2021 murders of Roger Shelby and Andrea Verser in North Little Rock. Turner was sentenced to two concurrent life terms without parole after he was found guilty of orchestrating the fatal shooting of both victims. Turner now challenges his convictions on three grounds: (1) insufficient evidence of his participation as an accomplice in the felony-capital murders; (2) the circuit court's limitation on voir dire questioning regarding range of punishment; and (3) the admission of Snapchat evidence via testimony from a State witness. We affirm.

I. *Facts and Procedural Background*

The evidence presented at trial establishes the following account of events. On April 26, 2021, Shelby and Verser were sitting in a parked car after returning from dinner when they were ambushed by three gunmen. In a matter of seconds, twenty-three bullets were

1

fired into the vehicle, striking Shelby and Verser repeatedly, killing both. Shelby, age twenty, and Verser, age twenty-three, were killed instantly. Turner, a close acquaintance of Shelby's, was implicated in facilitating the ambush. Testimony and phone records from the night showed that Turner had communicated with the gunmen multiple times just before the shooting, despite later denying that he knew them.[1] These communications—coupled with security footage and witness testimony—presented Turner as the primary organizer of the murders.

Turner's relationship with Shelby was defined by criminal activities, including the selling of drugs and fraudulent acquisition of pandemic-relief funds. Over time, these joint ventures generated over $20,000, which was stored in Shelby's apartment. The State presented evidence at trial that Turner, motivated by this large sum, orchestrated the killings to claim these funds. Turner set the stage by coordinating to meet with Shelby, who was intoxicated that evening. Phone records revealed that Turner had contacted Shelby several times to ensure he would return to the Greens apartment complex in North Little Rock and requested that Shelby sit in the passenger seat. The State alleged Turner's intent to control the victims' movements highlighted his calculated role in the crime.

Notably, Turner had begun communicating with one of the gunmen, Joecortland Roberson, hours before the murders. The two men exchanged over a dozen phone calls both before and after the incident. Despite this, Turner, in police interviews, denied any knowledge of Roberson in an attempt to cover up his involvement. Evidence from security

---

[1]Joecortland Roberson and Martez Holmes were identified as two of the three gunmen. They were charged with felony-capital murder but pled guilty to receive lesser charges. The third gunman was never identified.

footage corroborated this connection: shortly before the shooting, Turner was seen near the parking lot with the gunmen, talking on his phone as the three masked men approached Shelby's vehicle. According to the State, this footage, along with eyewitness accounts, further implicated Turner's active role in coordinating the attack.

After the shooting, Turner attempted to conceal his involvement. He approached a responding officer at the scene and pretended to search for Shelby, despite having walked by Shelby's body moments earlier. He even called Shelby's phone while standing near the deceased victim, portraying concern in order to mislead law enforcement. Surveillance footage captured Turner and the gunmen leaving his apartment (located at the Greens apartment complex) in a vehicle shortly after the murders—around 1:00 a.m. Turner eventually fled to Dallas, Texas.

Further evidence emerged during law enforcement's investigation, including cellular-location data and corroborating statements from witnesses. Forensic analysis revealed that three separate firearms, including a Glock 9mm and a .40-caliber handgun, were used in the murders. Though one weapon was recovered, Turner failed to provide police with his own .40-caliber handgun, which he claimed to have lent to another person. Despite promising to retrieve it for testing, Turner did not follow through. Additionally, the State claimed that Turner's use of Snapchat to communicate with a key witness, Oksana Pavliv, supported its theory of his concealment. Pavliv testified that after she informed Turner of police questioning, he sent a Snapchat message instructing her to withhold information about the gun.

In pretrial motions, Turner's counsel sought to exclude Pavliv's testimony about this Snapchat message, citing a discovery violation and arguing the State failed to demonstrate that the original message was unavailable as required by Arkansas Rule of Evidence 1001. During voir dire, Pavliv explained that Snapchat automatically deletes viewed messages and that she could not retrieve the message. The circuit court ultimately allowed Pavliv's testimony, treating the Snapchat exchange like a phone conversation.

Turner's trial counsel also raised issues concerning voir dire, seeking to question potential jurors about their views on sentencing, specifically mandatory minimums. The State objected, asserting that such questions would prejudice the jury by shifting focus to punishment rather than guilt. Defense counsel argued that the State had referenced the death penalty, invoking *State v. Dillard* to support his voir dire approach. However, the court upheld the State's objection and limited voir dire questioning on sentencing considerations but allowed counsel to inquire about mandatory minimums in general terms without specific reference to the length of punishment. The jury was further instructed to disregard punishment considerations in reaching a verdict on guilt.

At the close of the State's case, Turner's counsel moved for a directed verdict, arguing that no evidence established Turner's direct participation in the crime, and challenging his designation as an accomplice to aggravated robbery. The circuit court denied the motion, finding sufficient evidence of Turner's involvement, particularly through accomplice liability. Jury instructions included accomplice liability in the context of felony-capital murder committed during an aggravated robbery. Upon deliberation, the jury found

Turner guilty on both counts. He elected to be sentenced by the circuit court, which sentenced him to concurrent life terms without the possibility of parole.

## II. *Discussion*

### A. Sufficiency of the Evidence

For his first point on appeal, Turner claims the circuit court erred in denying his motion for directed verdict because there was "insufficient circumstantial evidence" to support his convictions. He is misguided. Contrary to Turner's claims, substantial evidence established that he, as an accomplice, aided and abetted in the aggravated robbery and thus the related felony-capital murders.

A motion for a directed verdict is a challenge to the sufficiency of the evidence.[2] When considering a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict.[3] The court will affirm a conviction if there is substantial evidence to support it, meaning the evidence is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture.[4] Substantial evidence can be direct or circumstantial.[5] Whether circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide, not this court.[6]

---

[2] *See McClendon v. State*, 2019 Ark. 88, at 3, 570 S.W.3d 450, 452.

[3] *See Wofford v. State*, 2023 Ark. 138, at 4, 675 S.W.3d 137, 139.

[4] *Id.*

[5] *McKenzie v. State*, 362 Ark. 257, 262, 208 S.W.3d 173, 175 (2005).

[6] *Cone v. State*, 2022 Ark. 201, at 7, 654 S.W.3d 648, 655.

Likewise, the jury, rather than this court, is responsible for resolving questions concerning the credibility of witnesses.[7] In resolving conflicting testimony and inconsistent evidence, the jury is entitled to believe the State's account of the facts rather than the defendant's version.[8]

In cases like this one involving accomplice liability, a conviction may be affirmed if substantial evidence demonstrates that the defendant acted as an accomplice in the commission of the offense.[9] Pursuant to Arkansas Code Annotated section 5-2-403(a)(1)–(a)(2) (Repl. 2013), a person is considered an accomplice if, with the intent to promote or facilitate the crime, they encourage, advise, or coerce another to commit the offense, or assist in planning or executing it. When individuals collaborate in committing a crime, each is criminally liable for the actions of the other.[10] A person cannot escape liability simply by not participating in every aspect of the offense.[11] Key factors in establishing accomplice liability include the defendant's proximity to the crime, their opportunity to engage in it, and their association with an involved party in a way that suggests joint participation.[12] The

---

[7] *Wofford*, 2023 Ark. 138, at 4, 675 S.W.3d at 139.

[8] *Id.*

[9] *Smith*, 2022 Ark. 95, at 7.

[10] *Bienemy v. State*, 374 Ark. 232, 236, 287 S.W.3d 551, 554 (2008).

[11] *Id.*

[12] *Smith v. State*, 2022 Ark. 95, at 8.

defendant's actions and statements before or after the crime can also serve as corroborative evidence.[13]

In this case, Turner was convicted as an accomplice in the commission of an aggravated robbery and the related felony-capital murders. His conviction must be affirmed if substantial evidence shows that, acting alone or with one or more other persons, he committed or attempted to commit an aggravated robbery, and in the course of and in furtherance of the felony or in immediate flight therefrom, he or an accomplice caused the death of a person under circumstances manifesting extreme indifference to the value of human life.[14] An aggravated robbery occurs if, with the purpose of committing a felony or misdemeanor theft, a person causes the death of another person.[15]

Turner's role as an accomplice in the aggravated robbery and related felony-capital murders was far more involved than mere presence, as he contends. The evidence presented by the State shows that Turner and his accomplices committed an aggravated robbery and in furtherance of this crime murdered the two victims, meeting the necessary elements of the offense of felony-capital murder.

Turner knew that Shelby kept a substantial amount of cash from their drug dealing and pandemic-relief-fund scams and expressed concern that Shelby was vulnerable to being robbed. He planned and orchestrated Shelby's murder to obtain the over $17,000 in cash he knew Shelby kept in his apartment. Indeed, he was intricately connected to the planning

---

[13]*MacKool v. State*, 365 Ark. 416, 433, 231 S.W.3d 676, 690–91 (2006).

[14]*Smith*, 2022 Ark. 95, at 7; Ark. Code Ann. § 5-10-101(a)(1)(A)(vi) & (B) (Supp. 2019).

[15]*Id.*

7

and execution, as evidenced by his communications with Roberson and his orchestrated attempts to position Shelby and Verser for the attack. Turner directed Shelby to ride in the passenger seat, waited for them to arrive, and coordinated phone calls that served as signals for Roberson and the gunmen. Security footage confirmed Turner's meeting with the gunmen in the parking lot, and calls between Turner and Roberson clustered in the minutes immediately before the attack, ceasing only while the murders were being committed. Afterward, Turner met the gunmen in his apartment, later fled the scene with them, and ultimately attempted to mislead Pavliv and authorities, further implicating his involvement.

Likewise, the State presented substantial evidence that Turner's conduct following the murders is consistent with his role as an accomplice. Turner's actions in approaching Shelby's body without offering aid, combined with his insistence that Pavliv not disclose details to the police, illustrate his attempts to conceal his role. His prior statements to police, denial of any connection to Roberson, and eventual flight to Dallas, Texas, despite claims of innocence, underscore an awareness of guilt and intent to evade prosecution. The facts and inferences drawn from Turner's coordinated actions, his strategic positioning, and his post-crime behavior clearly satisfy the criteria necessary to convict him as an accomplice in the aggravated robbery, which is a necessary element of his felony-capital murder convictions. In the same vein, the evidence presented by the State supported his felony-capital murder convictions, substantiating the jury's verdict. Thus, the circuit court did not err in denying Turner's motion for a directed verdict.

B. Restricting Trial Counsel's Voir Dire Regarding Range of Punishment

For his second point on appeal, Turner contends that the circuit court abused its discretion by restricting his counsel from fully questioning prospective jurors on the range of punishment during voir dire. Specifically, Turner argues that his counsel's attempts to confirm jurors' willingness to consider the full range of punishment were improperly limited. However, the record shows that the circuit court permitted general questions regarding mandatory minimum sentences, which Turner's counsel did not pursue. The jury was instructed not to consider punishment during the guilt phase, which is consistent with our procedural standards.

Circuit courts are afforded wide discretion over the scope of voir dire, and appellate courts will not overturn restrictions absent a clear abuse of that discretion.[16] Abuse of discretion is "a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration."[17] Even if some error occurs, it is not reversible unless the appellant also demonstrates that he was prejudiced by it.[18] Although Turner cites cases in which courts permitted questioning on maximum sentences, voir dire about punishment is left largely to the circuit court's discretion.

Turner has not shown that the circuit court's limitation on voir dire was arbitrary or unreasonable in any way. Furthermore, even if this restriction was deemed erroneous,

---

[16] *Harris v. State*, 2023 Ark. 64, at 14, 663 S.W.3d 355, 364.

[17] *Threadgill v. State*, 347 Ark. 986, 993, 69 S.W.3d 423, 428 (2002).

[18] *Bishop v. State*, 2023 Ark. 150, 10, 675 S.W.3d 869, 876.

Turner fails to demonstrate resulting prejudice. His counsel accepted the jury without identifying any juror as biased due to the voir dire limitation. Turner ultimately received a life sentence without parole, the only sentence available under his election for court sentencing. Nonprejudicial errors in jury selection are not grounds for reversal. Accordingly, Turner's claim falls well short of the mark that would warrant reversing the circuit court's decision here.

## C. Pavliv's Testimony

For his final point on appeal, Turner contends that the circuit court abused its discretion in allowing testimony from Pavliv about a self-destructing Snapchat message that Turner sent her in violation of Arkansas Rule of Evidence 1002. Specifically, Turner contends that admitting this testimony violated the best-evidence rule because the message itself was not produced. However, the State disputes the rule's applicability, given that Snapchat messages are designed to be deleted automatically. Testimony from Pavliv established that Snapchat messages self-destruct and were unavailable for retrieval, much like a telephone conversation, which does not produce a permanent record. Thus, the State claims the general exception to the best-evidence rule, Arkansas Rule of Evidence 1004, is implicated.

Evidentiary decisions rest within the circuit court's broad discretion and are overturned only when the court acts arbitrarily or without due consideration.[19] The best-evidence rule applies only if an "original" exists, but Pavliv's testimony established that the Snapchat communication, as was customary, was automatically deleted. In such instances,

---

[19]*Id.*

Rule 1004 of the Arkansas Rules of Evidence permits other evidence of the message's contents when the original is lost or destroyed without bad faith. Because Rule 1004 clearly applies here, the circuit court acted within its discretion in admitting Pavliv's testimony under this exception. Turner further argues that the State was required to attempt retrieval of the Snapchat message, yet Rule 1004 does not impose this requirement. Indeed, Rule 1004's provisions are disjunctive; it is enough that the message was lost without bad faith, which was supported by Pavliv's testimony.[20] It should also be noted that courts in other jurisdictions have found that the self-destructing nature of Snapchat messages leaves witness testimony as the sole admissible evidence in such cases, reinforcing the circuit court's decision here.[21] Accordingly, Turner's claim here also falls well short of the mark that would warrant reversing the circuit court's decision on this point.

### III. *Rule 4-3(a) Requirement*

Turner received two concurrent sentences of life imprisonment, so the record has been reviewed for all errors prejudicial to him as required by Arkansas Supreme Court Rule 4–3(a). No reversible error was found.

Affirmed.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes Jr.*, Ass't Att'y Gen., for appellee.

---

[20] *See, e.g.*, *Dillard v. State*, 2020 Ark. App. 419, at 10.

[21] *See, e.g.*, *People v. Rose*, 2021 WL 650597, at 2–3 (Mich. Ct. App. Feb. 18, 2021) (unpublished per curiam) (holding that, witness testimony about Snapchat messages received from defendant not barred by best-evidence rule "because defendant has not established that the original was actually available [when] [t]he witness testified that she 'unfriended' defendant and that this action deleted the messages from her phone [and] [a]s the prosecutor stated, '[T]he text messages disappear.'").